UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

FRANCES HLUSKA

                    Plaintiff,

                                        **REPORT AND RECOMMENDATION**
                                        **06-CV-0485 (LEK)**

MICHAEL J. ASTRUE[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


# Jurisdiction

1.      This case was referred to this Court by Chief Judge Norman A. Mordue, pursuant

to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3.  This case has

proceeded in accordance with General Order 18 of this Court which sets forth the

procedures to be followed when appealing a denial of Social Security benefits.  Both

parties have filed briefs.  For the reasons discussed below, I recommend that the matter

be remanded.


# Background

2.      Plaintiff Frances Hluska challenges the Administrative Law Judge's ("ALJ")

determination that she is not entitled to Disability Insurance Benefits ("DIB") or

Supplemental Security Income ("SSI"), under the Social Security Act ("the Act").

Plaintiff alleges that she was disabled from September 1, 2001, because of Class III

---

[1] On February 12, 2007, Michael J. Astrue was sworn in as the Commissioner of the Social Security
Administration.  Pursuant to Federal Rules of Civil Procedure 25(d)(1), he is automatically substituted for
former Commissioner Jo Anne B. Barnhart as the defendant in this action.

angina and triple vessel coronary artery disease, status post coronary artery bypass grafting times three; right cubital tunnel syndrome, status post cubital tunnel release and anterior transposition of left ulnar nerve; right carpal tunnel syndrome status post release; obesity; anxiety and depression. In denying Plaintiff's claim, the ALJ found that Plaintiff was able to perform various sedentary jobs, and therefore, was not entitled to DIB or SSI (R. at 26).[2] Plaintiff met the disability insured status requirements of the Act at all times up until December 31, 2005.

## Procedural History

3. Plaintiff filed for DIB and SSI on January 14, 2002, with a protective filing date of January 4, 2002[3] (R. at 56, 474). Plaintiff's DIB and SSI claims were denied on March 29, 2002 (R. at 28, 486). Following a hearing, the ALJ issued a decision on May 18, 2004,[4] in which he found Plaintiff had not met the requirements for disability (R. at 19-26). Plaintiff's request for review by the Appeals Council was denied (R. at 7-10).

4. On April 19, 2006, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting that the Court review the decision of the ALJ pursuant to Section 405(g) and 1383(c)(3) of the Act, modify the decision of Defendant and grant DIB and SSI to Plaintiff for the period beginning September 1, 2001. Defendant filed an answer to Plaintiff's complaint on August 23, 2006, requesting the Court to dismiss

[2] Citations to the underlying Administration are designated as "R."

[3] This Court has been unable to find evidence of Plaintiff's protective filing date in the record. However, Plaintiff states she protectively filed on January 4, 2002, and Defendant accepted Plaintiff's procedural history. See Plaintiff's Brief, p. 2; Defendant's Brief, p. 1. Thus, Plaintiff's protective filing date of January 4, 2002, is accepted as accurate.

[4] The date on the ALJ's decision was not legible (R. at 26). However, the date can be found on Plaintiff's letter to the Appeals Council (R. at 13).

Plaintiff's complaint.  Plaintiff submitted a Memorandum of Law (hereinafter called "Plaintiff's Brief") on October 9, 2006.  On January 14, 2007, Defendant filed a Memorandum of Law in Support of His Motion (hereinafter called "Defendant's Brief") for Judgment on the Pleadings[5] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Facts

### Medical Examiners

Plaintiff went to the Rome Memorial Hospital on September 4, 2000, complaining of numbness in her arm, as well as pain in her arm and chest (R. at 232).  Plaintiff was discharged several hours later with the instructions to take Motrin and follow up with her treating physician, Dr. Bulawa (R. at 233, 234).

Plaintiff met with cardiologist Dr. Desai at the Rome Memorial Hospital on September 12, 2000, for an echocardiogram at the referral of Dr. Bulawa (R. at 107-108).  It showed a normal aortic valve, mitral valve, pulmonic, and tricuspid valves.  Id. The aortic root size was normal, the left atrial chamber size was normal, the left ventricular chamber size was normal, the left ventricular diastolic function was normal, and the right ventricular chamber size was normal.  Id.  No pericardial effusion was present and the Doppler echocardiogram revealed no significant abnormalities.  Id.

---

[5] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceedings as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

Plaintiff met with Jeffrey Amidon, D.O.[6] at the Rome Memorial Hospital on September 28, 2000, for an exercise stress test (R. at 109).  Plaintiff was positive for the stress test and was started on Nitroglycerin and aspirin (R. at 110).  Plaintiff was told she would most likely need a heart catheterization (R. at 109).

On October 3, 2000, Plaintiff met with Dr. Desai at St. Luke's Healthcare (R. at 118).  Dr. Desai performed a "[l]eft heart cardiac catheterization, selective coronary artery angiogram, [and] left ventriculogram."  Id.  After reviewing the results, Dr. Desai recommended Plaintiff undergo a "complete coronary artery revascularization with multivessel coronary artery bypass graft surgery with probable complete aterial revascularization" (R. at 119).

On October 4, 2000, Plaintiff went to St. Luke's Healthcare and met with cardiologist, Dr. Joyce[7] (R. at 116).  Plaintiff was diagnosed "with Class III angina pectoris and severe three vessel coronary artery disease with occlusion of the LAD and obtuse marginal branches as well as an osteo right coronary artery stenosis" (R. at 117).  Dr. Joyce determined that a coronary artery bypass was necessary.  Id.

Plaintiff was transferred from St. Luke's to St. Elizabeth's Medical Center on October 4, 2000 (R. at 121).  On October 10, 2000, Plaintiff "underwent a coronary artery bypass grafting, times three, with left radial artery to the posterior descending artery, left saphenous vein from the aorta to the left anterior descending, with a left internal mammary artery T graft to the diagonal" (R. at 114).  Plaintiff "was transferred to the cardiothoracic intensive care unit in stable and satisfactory condition" (R. at 113).

---

[6] Doctor of Osteopathic Medicine.  American Osteopathic Association, *What is a Doctor of Osteopathic Medicine (D.O.)*, http://www.osteopathic.org/index.cfm?PageID=ado_whatis (last visited on Dec. 22, 2008).
[7] Dr. Joyce is employed by the Cardiac Surgery Associates, P.C., along with Dr. Carr (R. at 131, 129).

Plaintiff was discharged on October 14, 2000 with instructions to take Cardizem,[8] Aspirin, Colace,[9] Toprol,[10] Zocor,[11] and Lortab[12] (R. at 114).

On October 27, 2000, Plaintiff met with Dr. Desai,[13] and complained of feeling tired (R. at 137).

Dr. Joyce sent a letter to Dr. Amidon, and copied to Dr. Desai, on October 31, 2000 (R. at 131).  Dr. Joyce stated that Plaintiff was doing well, despite some redness, swelling, tenderness, and inflammation at the incision site.  Id.  Plaintiff was started on Keflex[14] for ten days.  Id.

Plaintiff went to the Rome Memorial Hospital on November 8, 2000, complaining of shortness of breath and an infection in her arm at the graft site (R. at 199, 195, 196).  The hospital found "[n]ew changes of a median sternotomy.  Otherwise no change or acute cardiopulmonary disease" (R. at 206).  No fracture or dislocation was found in Plaintiff's arm (R. at 207).  Plaintiff was discharged several hours after being admitted (R. at 198).

Dr. Joyce sent another letter to Dr. Amidon, and copied to Dr. Desai, on November 9, 2000 (R. at 130).  Plaintiff had complained of shortness of breath and an infection at the incision cite.  Id.  Plaintiff's chest x-ray looked good and Dr. Joyce was not concerned about Plaintiff's infection.  Id.

---

[8] Trademark for diltiazem hydrochloride, a vascodilator.  *Dorland's Illustrated Medical Dictionary*, 300, 527 (31st ed. 2007).
[9] Trademark for docusate sodium, a stool softener.  *Dorland's* at 389, 56.
[10] Trademark for metoprolol succinate, "used for the treatment of angina pectoris and hypertension…." *Dorland's* at 1966.
[11] Trademark for simvastatin, used to treat hypercholesterolemia.  *Dorland's* at 2120, 1743.
[12] Trademark for a combination of hydrocodone bitartrate, "an analgesic and antitussive," and acetaminophen.  *Dorland's* at 1090, 890.
[13] The treatment notes do not indicate who Plaintiff met with, but the record index states the notes were from Dr. Desai (R. at 137).
[14] Trademark for cephalexin, an antibiotic.  *Dorland's* at 992, 335.

Plaintiff met with Dr. Desai[15] again on December 8, 2000 (R. at 136).  Plaintiff stated she was feeling pretty good, but noted some sharp pains in her left breast.  Id.  Plaintiff saw Dr. Desai again on January 8, 2001 (R. at 135).  Plaintiff stated she felt okay, but her arm remained numb where the scar was.  Id.  Plaintiff saw Dr. Desai again on February 9, 2001 (R. at 134).  Plaintiff complained of chest pain and occasional sharp pains in her left breast.  Id.

On January 31, 2001, Dr. Desai completed a form sent by the New York State Office of Temporary and Disability Assistance Division of Disability Determinations (R. at 344).  Dr. Desai diagnosed Plaintiff with coronary artery disease, status post coronary artery bypass graft, and hypercholesterolemia.  Id.  Plaintiff's current symptoms included burning in her insides, shortness of breath, and left arm numbness.  Id.  Plaintiff was taking Xanax,[16] Toprol, Zocar, and ASA[17] (R. at 345).  Dr. Desai stated Plaintiff's chest pain was located mid-sternal and radiated to her left arm.  Id.  The chest pain was described as a burning sensation, and generally lasted five minutes.  Id.  Dr. Desai opined that Plaintiff could occasionally lift and carry fifty pounds, had no limitation to stand and/or walk, and had no limitation to sit (R. at 347).  Dr. Desai also opined that Plaintiff was limited in her ability to push and/or pull due to numbness in her left hand/arm from the radial artery harvest for bypass.  Id.  Finally, Dr. Desai stated Plaintiff was limited in her ability to manipulate her left arm/hand.  Id.

---

[15] See n. 4.
[16] Trademark for alprazolam, "an antianxiety agent…."  *Dorland's* at 2113, 55.
[17] Aspirin.  *Dorland's* at 163, 14.

Cardiologist Dr. Carr sent a letter on February 13, 2001, to Dr. Amidon and copied to Dr. Desai (R. at 129).  Dr. Carr stated Plaintiff's incisions were healing well and there was no evidence of infection.  Id.

Plaintiff went to the Rome Memorial Hospital on April 17, 2001, complaining of shortness of breath, weakness in her left arm, and anxiety (R. at 187).  The Hospital did not find an interval change or acute cardiopulmonary disease (R. at 189).  Plaintiff was discharged several hours later (R. at 186).

On May 8, 2001, Plaintiff called Dr. Desai crying, stating she had been to the hospital three times in the past week and was placed on Xanax for anxiety (R. at 133).  She also complained her insides were burning and her left arm was numb.  Id.  Plaintiff was scheduled for an appointment with Dr. Desai on May 14, 2001. Id.

Plaintiff went to the Rome Memorial Hospital on May 18, 2001, complaining of mild chest pain, shortness of breath, and left arm numbness (R. at 174, 175).  Plaintiff thought she was having a panic attack (R. at 173).  There was no acute cardiopulmonary disease or significant change of Plaintiff's heart (R. at 181).  Plaintiff was released a few hours later when she was stable and pain free (R. at 173).

Plaintiff underwent an exercise stress test on August 6, 2001, with Dr. Amidon (R. at 139).  Dr. Amidon found that while the stress test was technically positive, demonstrating issues with her cardiac responses, Plaintiff had a "very good tolerance to exercise for her age" (R. at 140).

Plaintiff went back to the Rome Memorial Hospital on August 13, 2001, after feeling faint, lightheaded, and dizzy for five days (R. at 278).  Plaintiff was discharged after her condition was stable with instructions to rest and avoid the heat (276-277).

Plaintiff had an echocardiogram at Dr. Desai's office on September 26, 2001 (R. at 253). Dr. Desai found "1. Grossly no evidence of valvular heart disease. 2. Normal sized left ventricular chamber, with well preserved normal left ventricular systolic and diastolic function. 3. Dopler echocardiographic findings are hemodynamically insignificant with presence of mild tricuspid valve insufficiency." (R. at 253-254).

On November 25, 2001, Plaintiff went to the Rome Memorial Hospital complaining of a cold, sweats, sore throat, pain over her left breast, and vomiting (R. at 266-267). Plaintiff was diagnosed with bronchitis (R. at 268). The Hospital did not find any evidence for an acute disease in her chest x-ray (R. at 271). Plaintiff was discharged a few hours after being admitted once her condition was stable (R. at 269).

On November 29, 2001, Plaintiff underwent electromyography and electrodiagnosis testing with Dr. Hong,[18] at the request of Dr. Bulawa (R. at 281). Dr. Hong noted the tests were "compatible with mild to moderate stage of right carpal tunnel syndrome." Id.

Plaintiff saw Dr. Bulawa on January 23, 2002, complaining of anxiety, headaches, and an inability to sleep (R. at 463). Dr. Bulawa prescribed Ambien[19] and Xanax at night. Id.

On January 25, 2002, Dr. Tan[20] wrote a letter to Dr. Bulawa diagnosing Plaintiff with carpal tunnel syndrome and cubital tunnel syndrome in her right hand (R. at 296-

---

[18] Dr. Hong describes her practice as pertaining to "Physical Medicine and Rehabilitation" as well as "EMG and Electrodiagnosis" (R. at 281.
[19] Trademark for zolpidem tartrate, treats insomnia. *Dorland's* at 58, 2120.
[20] The record indicates that Dr. Tan is an orthopedist and a hand surgeon (R. at 349).

297).  Dr. Tan prescribed Vioxx[21] and Celebrex,[22] instructed her to wear a wrist brace, and soak her wrist in warm water (R. at 297).

On January 30, 2002, Dr. Bulawa filled out a portion of a disability form sent by the New York State Office of Temporary and Disability Assistance Division of Disability Determinations (R. at 334).  In it, Dr. Bulawa listed Plaintiff's current symptoms, but they were largely illegible.  Id.  Dr. Bulawa indicated Plaintiff's significant psychiatric disorder was anxiety (R. at 335).  Dr. Bulawa opined that Plaintiff did not have any suicidal features and she could handle her payment benefits (R. at 340).  Dr. Bulawa also opined that Plaintiff could lift and carry ten pounds occasionally, could stand/or walk up to six hours, and had no limitation to sit.  Id.  Dr. Bulawa indicated that Plaintiff was limited in her ability to push and/or pull, but did not state what that limitation was.  Id. Dr. Bulawa also stated that Plaintiff had other limitations, but did not state what those limitations were (R. at 341).

Plaintiff underwent carpel tunnel release, synovectomy, and epineurolysis of the right nerve on April 9, 2002 (R. at 411).  Plaintiff saw Dr. Bulawa on April 10, 2002 (R. at 458).  Plaintiff complained of pain from her carpal tunnel surgery and was instructed to take Tylenol with Codeine.  Id.

Plaintiff saw Dr. Tan on April 19, 2002, to remove her operative dressings and sutures (R. at 513).  Dr. Tan found the incision to be clean and dry without evidence of infection.  Id.  Plaintiff was instructed to soak her wrist and wear a splint.  Id.  Plaintiff saw Dr. Tan again on May 3, 2002, with no new complaints or problems (R. at 512).  Dr.

---

[21] Trademark for rofecoxib, an anti-inflammatory.  *Dorland's* at 2086, 1677.
[22] Trademark for celecoxib, an anti-inflammatory.  *Dorland's* at 317.

Tan noted Plaintiff had difficulty closing her hand and had poor range of motion in her finger. <u>Id</u>. Dr. Tan recommended physical therapy. <u>Id</u>.

Plaintiff saw registered physician's assistant, M. Shane Angleton, on May 13, 2002, complaining of pain in her right knee (R. at 456). Plaintiff stated she had fallen because of uneven ground.[23] <u>Id</u>. Plaintiff stated her knee made a popping and cracking sound when she walked. <u>Id</u>. Plaintiff also complained of mild pain in her right ankle. <u>Id</u>. X-rays indicated either "positional changes, or some mild right medial joint space narrowing of the knee." <u>Id</u>. Plaintiff was instructed to see an orthopedist. <u>Id</u>.

Plaintiff was in a house fire while babysitting three children on May 15, 2002 (R. at 466). Plaintiff was taken to University Hospital/Upstate Medical University. <u>Id</u>. Plaintiff had second and third degree burns totaling eight percent of her body surface to her left arm, right arm, and back. <u>Id</u>. Plaintiff also had mild smoke inhalation. <u>Id</u>. The Hospital excised her burns and completed split-thickness skin grafts to her left arm. <u>Id</u>. Plaintiff was discharged on May 27, 2002. <u>Id</u>.

Plaintiff went to the Burn Center of the University Hospital on May 31, 2002, for a follow up (R. at 469). Dr. Bonaventura noted Plaintiff was doing fairly well, but was complaining of an inability to sleep. <u>Id</u>. Dr. Bonaventura found the burns on Plaintiff's back were almost healed, her grafts had healed, and she had an excellent motion in her arm. <u>Id</u>. Plaintiff was back at the Burn Center on June 4, 2002, June 11, 2002, and June 25, 2002 complaining of pain (R. at 470-472).

---

[23] On July 16, 2002, Plaintiff told Dr. Zaleski she hurt her knee falling down the stairs (R. at 370). Plaintiff then informed Dr. Mutty, on August 19, 2003, she hurt her knee after getting "in a fight with a 300 pound woman and was 'flung off a porch' and then the other person landed on top of her knee" (R. at 413).

Plaintiff had an MRI of her right knee on June 14, 2002 (R. at 361).  Dr. Burgreen, the physician who completed the MRI, found a "[l]ongitudinal split tear involving the body of the lateral meniscus extending to the apex of the meniscus."  Id.

On June 19, 2002, Plaintiff met with Dr. Bulawa complaining of right knee discomfort (R. at 454).  Dr. Bulawa instructed Plaintiff to take off her knee brace and to start physical therapy.  Id.  Dr. Bulawa also referred Plaintiff to Dr. Zaleski, an orthopedist, to discuss a possible surgical intervention.  Id. (R. at 366).

Plaintiff met with physical therapist, Michael Foster, on July 8, 2002 (R. at 453).  Plaintiff stated she had pain in her right knee that was especially prevalent during prolonged standing and when climbing up and down the stairs.  Id.  Foster noted Plaintiff "tolerated all the[] exercises well."  Id.  Plaintiff saw Foster again on July 15, 2002 (R. at 450).  Plaintiff noted some improvement from the session.  Id.

On July 16, 2002, Dr. Zaleski wrote a letter to Dr. Bulawa concerning Plaintiff's right knee injury (R. at 370).  Dr. Zaleski stated Plaintiff attempted physical therapy, but her symptoms became worse. Id.  Plaintiff reported a cracking sound when she tried to walk up and down the stairs.  Id.  Plaintiff also described pain in her knee.  Id.  After discussing Plaintiff's various options, Plaintiff chose surgery (R. at 371).

Plaintiff's final meeting with Dr. Bonaventura, at the Burn Center, took place on July 23, 2002 (R. at 473).  Dr. Bonaventura noted Plaintiff had full motion in her elbow.  Id.  Dr. Bonaventura stated she did not have a good explanation for the tenderness Plaintiff was experiencing in her elbow, but opined that it could be due to pulling of her scar.  Id.  Dr. Bonaventura also concluded Plaintiff was not disabled from her burns.  Id.

Plaintiff saw physical therapist Foster again on July 22, 2002 (R. at 448).  Plaintiff stated she did not have much pain, but complained of some weakness.  Id.  Plaintiff was back at physical therapy on July 29, 2002, complaining of intermittent pain (R. at 447).  Plaintiff's physical therapy was placed on hold due to her upcoming surgery and was officially discharged on August 9, 2002.  Id.; (R. at 446).

Plaintiff began treatment with Wilson[24] at the New Hartford Psychiatric Division on July 30, 2002, complaining of depression and occasional anxiety (R. at 355).  Plaintiff attributed her anxiety to her triple bypass in 2000.  Id.  Plaintiff attributed her depression to the deaths of her father and brother, the adoption of her five children, and relationship issues with an ex-boyfriend.  Id.  Plaintiff also stated she was in a house fire in May 2002, resulting in burns to her forearm, elbow, and back.  Id.  She stated she had difficulty dealing with individuals who would stare and make remarks about her scars.  Id.  Plaintiff also complained she could only sleep four hours at night.  Id.  When she thought about her children, Plaintiff could not breathe and felt like she would suffocate.  Id.  Plaintiff denied any suicidal or homicidal ideations (R. at 356).  Plaintiff was diagnosed with Axis I, depression, not otherwise specified; and Axis IV, a GAF score of 60[25] (R. at 357).

Plaintiff met with Wilson again on August 13, 2002 (R. at 354).  Plaintiff complained she cried all the time and only slept four hours per night.  Id.  Plaintiff also

---

[24] The last name of the person Plaintiff met with is Wilson, the first name is illegible (R. at 357).  Wilson is an ANP, a nurse practitioner.  Id.

[25] A global assessment of functioning score of 51-60 indicates "[m]oderate symptoms OR any moderate difficulty in social, occupational, or school functioning."  The Washington Institute On-Line Training and Assessment, Global Assessment of Function (GAF) Scale (2008) http://depts.washington.edu/washinst/Training/CGAS/GAF%20Index.htm.

stated she would become agitated within one hour of taking Klonopin.[26]  Id.  Wilson increased Plaintiff's Ambien and decreased Plaintiff's Klonopin.  Id.

Plaintiff met with Dr. Bulawa on August 29, 2002, to discuss her impending surgery (R. at 383).

Plaintiff had right knee surgery on September 13, 2002 (R. at 368).  A severe synovitis and radial tear of the right lateral meniscus were found.  Id.  Plaintiff did well during the post operative course; she was discharged that day, and did not develop any complications.  Id.  Plaintiff's sutures were removed by Dr. Zaleski, on September 20, 2002, and her wounds were found to be clean.  Id.  Plaintiff was instructed to continue her intensive quads exercises and to start gentle range of motion exercises.  Id.

Plaintiff saw Dr. Bulawa on September 18, 2002, as a follow up to her right knee surgery (R. at 443).  Dr. Bulawa noted Plaintiff was doing well.  Id.

Plaintiff was back with Wilson on September 30, 2002 (R. at 353).  Plaintiff stated she was feeling better, her relationships were improving, and she was able to sleep for six hours.  Id.  However, Plaintiff called Wilson later that day complaining of increased anxiety.  Id.  Plaintiff was instructed to take Klonopin and follow up the next day.  Id.  Plaintiff met with Wilson on October 1, 2002, and stated the night before she suddenly felt very anxious and noted a shortness of breath (R. at 352).  Plaintiff stated before that day she had been doing well and did not know what brought on the sudden anxiety.  Id.  She did, however, voice concerns surrounding her fear of death, both for herself and her mother.  Id.

---

[26] Trademark for clonazepam, "an antipanic agent…."  *Dorland's* at 1003, 379.

Dr. Zaleski sent Dr. Bulawa another letter on October 15, 2002 (R. at 366). In it, Dr. Zaleski stated that Plaintiff complained of pain and tenderness in her right knee, but she was not compliant with her home exercises. Id.

Plaintiff saw Wilson again on November 4, 2002 (R. at 352). Plaintiff stated she was still feeling depressed and experienced more bad days than good. Id. Plaintiff also stated three days prior she began to occasionally have suicidal thoughts. Id.

Plaintiff saw Dr. Zaleski again on November 5, 2002 (R. at 365). Plaintiff had been compliant with her home exercises and stated she had no pain. Id. Plaintiff did complain she had difficulty going up and down the stairs, but stated she would practice her stairway exercises. Id.

On November 26, 2002, Plaintiff saw Wilson again (R. at 351). Plaintiff stated she had woken up with a panic attack. Id. Up until that panic attack, she had been doing well. Id. Plaintiff was upset because she could not see her children. Id. She took Klonopin during the panic attack and that decreased her panic slightly. Id.

Plaintiff saw Wilson again on December 3, 2002 (R. at 351). Plaintiff complained she was always depressed and was focusing on the death of her father and brother. Id. On January 6, 2003, Wilson noted Plaintiff's mood was good and she was doing well with her medications (R. at 350).

On January 3, 2003, Plaintiff saw Dr. Zaleski, for her right knee, and stated she was doing very well (R. at 364). Plaintiff noted only occasional pain, with no episodes of giving way, no locking, and no swelling. Id. Dr. Zaleski found Plaintiff had a full range of motion in her right knee. Id.

14

Plaintiff saw Dr. Tan, for her wrist surgery, on January 10, 2003 (R. at 422).  Dr. Tan noted moderate swelling, week thumb to little finger opposition, relative decrease in sensation in the distal ulnar and median innervations, and tenderness in the ulnar nerve at the elbow.  Id.  On January 23, 2003, Plaintiff complained to Dr. Tan, of "a high level of symptoms" and corrective surgery was scheduled (R. at 421).  Plaintiff saw Dr. Tan on February 7, 2003, for a pre-operative consultation for a left cubital tunnel release with anterior transposition of the ulnar nerve and carpal tunnel release (R. at 419).

Plaintiff had corrective surgery on February 11, 2003 (R. at 416).  Plaintiff met with Dr. Tan on February 20, 2003, at which time her dressings were removed and the surgical incision was found to be clean and dry without evidence of infection (R. at 416). On March 20, 2003, Dr. Tan found Plaintiff's range of motion was less than expected and prescribed physical therapy (R. at 415).

On April 7, 2003, Plaintiff complained of pain in her right knee but Dr. Zaleski found good range of motion (R. at 363).  Plaintiff stated she had slowed down on her home exercises.  Id.  Dr. Zaleski recommended Plaintiff keep her leg elevated and continue with her exercises.  Id.  Dr. Zaleski also noted Plaintiff was sixty pounds overweight, and losing weight would help her recovery.  Id.

Plaintiff met with Physician's Assistant, Timothy Mihm, on April 11, 2003, for right knee pain (R. at 435).  Plaintiff was started on enteric-coated Naproxen.[27]  Id.

Plaintiff saw Dr. Bulawa on April 16, 2003 (R. at 436).  Plaintiff complained of continued pain in her right knee and left ankle.  Id.  Dr. Bulawa started Plaintiff on

---

[27] An anti-inflammatory.  *Dorland's* at 1251.

Relafen[28] for her knee and Phentermine[29] to help her lose weight.  Id.  Dr. Bulawa opined that Plaintiff's ankle pain was because of walking abnormally due to her right knee injury.  Id.

Plaintiff went for an MRI of her right knee on April 28, 2003 (R. at 359).  This MRI was compared to one completed on June 14, 2002.  Id.  A longitudinal signal abnormality was found that could either be a persistent longitudinal split tear or a repaired tear.  Id.  A possible meniscal tear was found, but an arthroscopic evaluation was required to make a diagnosis.  Id.  However, Dr. Burgreen, who completed the MRI, noted he did not believe the meniscus was torn.  Id.  Dr. Burgreen also found mild joint effusion and mild lateral patella tilt (R. at 360).

Plaintiff met with Dr. Bulawa for a follow up of her knee on May 22, 2003 (R. at 431).  Dr. Bulawa chose to put Plaintiff back in physical therapy to help reduce pain and inflammation.  Id.  Dr. Bulawa also noted Plaintiff's weight would cause problems with her knee.  Id.

Plaintiff continued to complain of soreness at her June 2, 2003, visit with Dr. Zaleski (R. at 363).  Dr. Zaleski stressed the need for Plaintiff to lose weight and to continue her home exercises.  Id.  Dr. Zaleski also instructed Plaintiff to begin physical therapy.  Id.

Plaintiff met with physical therapist Michael Haley on June 5, 2003 (R. at 433-434).  Plaintiff complained of chronic right knee pain and a limited range of motion (R. at 434).

---

[28] Trademark for nabumetone, an anti-inflammatory.  *Dorland's* at 1645, 1248.
[29] An anorectic, "a substance that diminishes the appetite."  *Dorland's* at 1452, 97.

Dr. Zaleski saw Plaintiff for the final time on July 28, 2003 (R. at 362).  Plaintiff continued to feel pain in her knee and had gained weight since their last visit.  Id. Plaintiff also stated she felt tingling in her legs after prolonged walking.  Id.  Dr. Zaleski told Plaintiff another arthroscopy may be required, but Plaintiff should get her weight under control first.  Id.

On July 29, 2003, Dr. Bulawa completed a form titled: Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination (R. at 372).  In it, Dr. Bulawa found no evidence of limitations for Plaintiff's ability to see, hear, speak, use her hands, or in her mental functioning.  Id.  Dr. Bulawa also opined that Plaintiff was moderately limited in her ability to sit, and very limited in her ability to walk, stand, lift, carry, push, pull, bend, and climb.  Id.  Dr. Bulawa did not find any evidence of limitations in connection with any possible alcohol or drug use (R. at 373).  Dr. Bulawa also stated Plaintiff was restricted from prolonged sitting, standing, pushing, or pulling at work.  Id.

On August 19, 2003, Plaintiff saw Dr. Mutty[30] for treatment of her right knee because Dr. Zaleski was retiring (R. at 413).  Plaintiff complained her knee was swollen and she got sharp pains when she tried to walk.  Id.  Dr. Mutty found no obvious deformity and Plaintiff had nearly full range of motion.  Id.  Dr. Mutty recommended Plaintiff restart physical therapy.  Id.

On August 26, 2003, Plaintiff had a myocardial perfusion scan (R. at 426).  No perfusion defects were found to suggest an infarction or inducible ischemia.  Id.  A

_____

[30] The record suggests that Dr. Mutty is an orthopedist, as he replaced Dr. Zaleski.

portable chest view, obtained the same day, indicated no acute cardiopulmonary disease (R. at 427).

Plaintiff saw Dr. Desai on August 27, 2003 (R. at 376).  Plaintiff stated she was doing well.  Id.  Dr. Desai noted the following: "1. Acute onset of chest pain somewhat atypical for angina pectoris.  However, in view of coronary artery disease with previous surgery, cannot rule out atypical presentation of angina pectoris.  Rule out myocardial infarction.  2. Coronary artery disease status post multivessel coronary artery bypass graft surgery.  3. Hypercholesterolemia.  4. Depression, anxiety, and panic disorder" (R. at 377).  Plaintiff was instructed to start an aggressive antianginal medical regimen (R. at 378).

Plaintiff underwent an echocardiogram with Dr. Desai on August 28, 2003, at the Rome Memorial Hospital (R. at 379).  The test showed a "normal m-mode, 2-demensional echocardiogram and Doppler echocardiogram with color flow Doppler studies."  Id.  That same day, Plaintiff also underwent a graded exercise treadmill test with Myoview injection, with Dr. Parker (R. at 380).  Dr. Parker found the following: "1. Significantly positive graded exercise treadmill portion with greater than 2 mm downsloping depression in the inferior leads and 2 mm depression in the lateral precordial leads in a patient with known significant coronary artery disease status post coronary artery bypass graft.  2. Reassuring Myoview portion of testing" (R. at 381).

Plaintiff saw Dr. Tan on September 9, 2003, and her physical therapy notes for her wrist were reviewed (R. at 414).  Plaintiff's initial evaluation for physical therapy was completed on March 28, 2003, but she did not show for any subsequent appointments.  Id.  Plaintiff was discharged from physical therapy on May 8, 2003, for non-compliance.

18

Id.; (R. at 429).  A note, dated September 30, 2003, indicates that Plaintiff also did not attend any further appointments with Dr. Tan (R. at 414).

Dr. Bulawa completed a physical medical source statement ("MSS") on September 25, 2003 (R. at 390).  In it, Dr. Bulawa opined that Plaintiff's impairments have either lasted or could be expected to last at least twelve months (R. at 387).  Dr. Bulawa also opined that Plaintiff's depression, anxiety, and panic attacks affected Plaintiff's functional limitations and created an inability to handle low stress jobs.  Id.  Dr. Bulawa found Plaintiff's impairments were reasonably consistent with her symptoms and functional limitations and her pain would constantly interfere with her attention and concentration.  Id.  Dr. Bulawa opined that Plaintiff could sit for ten minutes before needing to get up and could stand for fifteen minutes before needing to sit or walk (R. at 387-388).  In an eight hour workday, Dr. Bulawa opined that Plaintiff could sit or stand for a total of less than two hours and would need to walk for six minutes at fifteen minute intervals (R. at 388).  Dr. Bulawa also found that (1) Plaintiff could only work at a position which allowed for shifting positions; (2) she would need to take unscheduled breaks at least every two hours for ten minutes; and (3) she should elevate her legs two feet every fifteen minutes during prolonged sitting (R. at 388-389).  When asked how often Plaintiff could lift less than ten pounds, Dr. Bulawa responded with "never."  Id.  Dr. Bulawa opined that Plaintiff could never climb ladders, could rarely twist and crouch, and could occasionally stoop and climb stairs.  Id.  Plaintiff's limitations were likely to produce good and bad days, and Plaintiff would likely miss more than four days of work per month due to her impairments.  Id.  Finally, Dr. Bulawa stated Plaintiff's conditions existed with the limitations he outlined since September 1, 2001 (R. at 390).

19

**Independent Medical Examiners**

Plaintiff met with independent medical examiner ("IME") Dr. Ganesh on February 20, 2002, at the request of the Social Security Administration ("SSA") (R. at 299).  Dr. Ganesh diagnosed Plaintiff with "1. Status post coronary artery bypass graft surgery.  2. Right carpal tunnel syndrome.  3. Anxiety and depression" (R. at 302).  Dr. Ganesh opined that Plaintiff had a fair prognosis.  Id.  Dr. Ganesh opined in her MSS that Plaintiff "has no physical limitation to sitting, standing, walking, climbing, bending, squatting, or in the use of upper extremity.  However, she should avoid heavy lifting, carrying, pushing, and pulling."  Id.

That same day, Plaintiff met with IME Kristen Barry, Ph.D., for a psychiatric examination at the request of the SSA (R. at 303).  Dr. Barry diagnosed Plaintiff with Axis 1, anxiety disorder, not otherwise specified (R. at 306).  Dr. Barry opined that Plaintiff's prognosis was fair.  Id.  In her MSS, Dr. Barry stated that Plaintiff,

> at this time, is able to follow and understand simple directions and instructions, and is able to maintain her attention and concentration.  She describes having physical problems including having a triple bypass surgery, which has led to some anxiety.  The claimant states that she gets very anxious regarding her health and is afraid that she will have another heart attack and die.  The claimant's allegations are found to be consistent with the examination results.  Id.

**RFC Analysis**

Joseph Dambrocia, Ph.D., completed a psychiatric review technique form, at the request of the SSA, on March 11, 2002 (R. at 307).  In it, he diagnosed Plaintiff with depression and an anxiety disorder, not otherwise specified (R. at 310, 312).  Dr.

Dambrocia opined that Plaintiff would have a mild restriction of daily living activities, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and found no repeated episodes of decompensation, each of extended duration (R. at 317).

Dr. Dambrocia also completed a mental residual functional capacity ("RFC") assessment on March 11, 2002, at the request of the SSA (R. at 321). In it, he opined that Plaintiff was not significantly limited in the understanding and memory category. Id. He also found Plaintiff was not significantly limited in the sustained concentration and persistence category, with the exception that Plaintiff was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them (R. at 321-322). Dr. Dambrocia also found Plaintiff was not significantly limited in the social interaction category, with the exception that Plaintiff was moderately limited in her ability to interact appropriately with the general public (R. at 322). Finally, Dr. Dambrocia opined that Plaintiff was not significantly limited in the adaption category, with the exception that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. Id.

On April 1, 2002, a physical RFC was completed by a disability analyst[31] at the request of the SSA (R. at 326, 333). The analyst opined that Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand and/or walk about four hours in an eight-hour workday, sit about six hours in an eight-hour workday, but did not make a finding as to Plaintiff's ability to push and/or pull (R. at 327). The analyst also opined that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl (R.

[31] The analyst's name was not legible and the individual does not appear to be a physician (R. at 333).

at 328).  The analyst did not find any manipulative limitations (R. at 329).  The analyst

did not make a finding as to whether Plaintiff had any visual, communicative, or

environmental limitations (R. at 329-330).

# Discussion

**Legal Standard of Review:**

A court reviewing a denial of disability benefits may not determine *de novo*

whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v.

Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the

Commissioner's determination will only be reversed if it is not supported by substantial

evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir.

1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is

evidence that amounts to "more than a mere scintilla," and it has been defined as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.

2d 842 (1971).  Where evidence is deemed susceptible to more than one rational

interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining evidence from both

sides, because an analysis of the substantiality of the evidence must also include that

which detracts from its weight."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258

(2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must

22

be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. See 20 C.F.R. §§ 404.1520, 416.920. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled.

This five-step process is detailed below:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled with-out considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

  While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

11. In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above:

1. The claimant met the nondisability requirements for a period of disability and Disability Insurance Benefits on September 1, 2001, and will remain insured for disability benefits at least through December 31, 2005.
2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability on September 1, 2001.
3. The claimant's degenerative joint disease with right carpal tunnel syndrome (status post release surgery), hypertensive coronary artery disease (status post bypass grafting), obesity, and chronic depression with anxiety traits are considered "severe" . . . .
4. These medically determinable impairments do not meet or medically equal one of the listed impairment's in Appendix 1, Subpart P, Regulation No. 4.  The claimant's depression has resulted in the following mental limitations set forth in "Part B" of the mental listings: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation, each of extended duration.

24

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible because they are inconsistent and the medical record does not support them.

6. The claimant has the residual functional capacity to perform a wide range of unskilled sedentary exertional activity, subject to walking and standing no more than four hours total per day; no more than occasional climbing, balancing, stopping, kneeling, crouching, and crawling; and no more than occasional relating with other persons. . . .

7. The claimant is unable to perform any of her past relevant work . . . .

8. The claimant is a younger individual . . . .

9. The claimant has a high school education . . . .

10. The claimant has no transferable skills from any past relevant work . . . .

11. The claimant has the residual functional capacity to perform a significant range of unskilled sedentary work . . . .

12. [T]here are a significant number of jobs in the national economy that she could perform . . . . [I]nclud[ing] lens inserter . . . ; waxer . . . ; and surveillance monitor . . . .

(R. at 25-26).  Ultimately, the ALJ found that Plaintiff was not under a disability at any time up through the date of his decision (R. at 26).

**Plaintiff's Allegations:**

Plaintiff challenges the decision of the ALJ on the basis that it was not supported by substantial evidence.  Specifically, Plaintiff argues that (1) the ALJ erred in evaluating Plaintiff's credibility; (2) the ALJ failed to follow the treating physician rule with respect to Dr. Bulawa; (3) the ALJ's RFC was not supported by substantial evidence; and (4) the vocational expert's ("VE") testimony was flawed because it was based on an incomplete hypothetical.

**Allegation 1: The ALJ Erred in Evaluating Plaintiff's Credibility**

Plaintiff argues that the ALJ erred in evaluating Plaintiff's credibility by not following SSR 96-7p and 20 C.F.R. § 404.1529.  See Plaintiff's Brief, pp. 17-19. Defendant responds by arguing that the ALJ appropriately considered Plaintiff's

subjective complaints in relation to the objective medical evidence.  See Defendant's Brief, pp. 16-18.

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence."  Lewis v. Apfel, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999) (internal citations omitted).   To this end, the ALJ must follow a two-step process to evaluate Plaintiff's contention of pain, set forth in SSR 96-7p, 1996 WL 374186, at *2:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) … that could reasonably be expected to produce the individual's pain or other symptoms….
> Second, … the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities….

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if Plaintiff's pain contentions are not supported by objective medical evidence, the ALJ must consider the following factors in order to make a determination of Plaintiff's credibility concerning his pain:

1. [Plaintiff's] daily activities;
2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;
3. Precipitating and aggravating factors;
4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate … pain or other symptoms;
5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of … pain or other symptoms;
6. Any measure [Plaintiff] use[s] or ha[s] used to relieve … pain or other symptoms;

26

7.  Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds Plaintiff's pain contentions are not credible, he must state his reasons "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Young v. Astrue, No. 7:05-CV-1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting Brandon v. Bowen, 666 F.Supp 604, 608 (S.D.N.Y. 1987)).

The ALJ began the two-step process by finding Plaintiff had the following medically determinable impairments: "degenerative joint disease with right carpal tunnel syndrome (status post release surgery), hypertensive coronary artery disease (status post bypass grafting), obesity, and chronic depression with anxiety traits…" (R. at 25). However, the ALJ did not continue on to make a determination as to whether these medically determinable impairments could reasonably cause Plaintiff's pain.  This was error.  See Hogan v. Astrue, 491 F.Supp.2d 347, 352-353 (W.D.N.Y. 2007) (remanding, in part, because the ALJ failed to find whether plaintiff's impairments "could reasonably be expected to produce the pain … she alleged" despite noting that the ALJ "carefully review[ed]" the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii)).

Further, while the ALJ discounted Plaintiff's claims of pain from her right knee injury, her burn injuries, and her hypertensive coronary artery disease, he clearly did not assess Plaintiff's credibility with consideration given to the seven factors shown above, and required by the Commissioner's regulations at 20 C.F.R. § 404.1529(3)(i)-(vii).  See also SSR96-7p.

27

Once the ALJ considered the Plaintiff's medical evidence and allegations of pain and/or limitations from her impairment(s), Social Security Ruling SSR 96-7p requires that she "…consider the entire case record and give specific reasons for the weight given to the individual's statements.  The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered,' or that 'the allegations are (or are not) credible.'"  See  SSR 96-7p.  In the instant case, the ALJ merely noted some of the symptoms and limitations Plaintiff claimed, apparently dismissed others, gave a cursory discussion of a very limited amount of medical evidence, and stated Plaintiff's allegations of impairment were "partially credible" (R. at 22).  This leaves Plaintiff, and the Court, with an insufficient understanding of how the ALJ viewed and weighted all of the evidence in this case, including Plaintiff's claim of mental, as well as physical limitations.

 Therefore, the ALJ erred in not following the appropriate legal standard.  Accordingly, it is recommended that this case be remanded to allow the ALJ an opportunity to comply with all of the requirements of SSR 96-7p and 20 C.F.R. §§ 404.1529 and 416.929.

### Allegation 2: The ALJ Failed to Follow the Treating Physician Rule with Respect to Dr. Bulawa

Plaintiff's second argument is that the ALJ failed to follow the treating physician rule by (a) not granting Dr. Bulawa controlling weight, and (b) not re-contacting Dr.

Bulawa to clarify ambiguities or conflicts.  <u>See</u> Plaintiff's Brief, pp. 11-13.  Defendant

responds by arguing that it was appropriate for the ALJ not to afford Dr. Bulawa

controlling weight and that there were no gaps in the record necessitating re-contact.

<u>See</u> Defendant's Brief, pp. 12-16.

### (a) Failure to Follow the Treating Physician Rule

According to the "treating physician's rule,"[32] the ALJ must give controlling weight

to the treating physician's opinion when that opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] record."  20 C.F.R. § 404.1527(d)(2); <u>see also</u> <u>Green-</u>

<u>Younger v. Barnhart</u>, 335 F.3d 99, 105 (2d Cir. 2003); <u>Shaw v. Chater</u>, 221 F.3d 126,

134 (2d Cir. 2000).  Also, "[f]ailure to provide 'good reasons' for not crediting the opinion

of a claimant's treating physician is ground for remand."  <u>Snell v. Apfel</u>, 177 F.3d 128,

133 (2d Cir. 1999) (<u>citing</u> <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998)).

Even if a treating physician's opinion is deemed not to be deserving of controlling

weight, an ALJ may nonetheless give it "extra weight" under certain circumstances.

Under 20 C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors

when determining the proper weight to afford the treating physician's opinion if it is not

entitled to controlling weight: (1) length of the treatment relationship and the frequency

of examination, (2) nature and extent of the treatment relationship, (3) supportability of

opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors

that are brought to the attention of the court.  <u>See</u> de Roman, 2003 WL 21511160, at *9

---

[32] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. §§ 404.1527 detailing the weight to be accorded a treating physician's opinion." <u>de Roman v. Barnhart</u>, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

(citing C.F.R. § 404.1527(d)(2)); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Here, the ALJ found that Dr. Bulawa's opinions were "partially credible" (R. at 22).  It is also clear from his narrative that the ALJ was engaging in a credibility analysis of Dr. Bulawa, and not a consideration of the appropriate *weight* to be granted to him as required by the Commissioner's regulations (R. at 22-23).  See 20 C.F.R. § 404.1527. This Court also notes that Dr. Bulawa did not testify at Plaintiff's hearing.  Thus, for the reasons stated above and the finding that Dr. Bulawa was "partially credible" was error. The decision of the ALJ may not be affirmed when "there is a reasonable basis for doubt whether the ALJ applied the correct legal principles…."  Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

### (b) Failure to Re-Contact

The ALJ has an affirmative duty to develop the record.  Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982).  This duty exists regardless of whether Plaintiff has counsel or is continuing *pro se*. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  If the evidence received is not adequate to determine whether an individual is disabled, additional information must be gathered by first re-contacting Plaintiff's treating physician.  20 C.F.R. § 404.1512(e)(1).

"The duty to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations."  Dickson v. Astrue, No. 1:04-CV-0511, 2008 WL 4287389, at *13 (N.D.N.Y. Sept. 17, 2008) (citing Devora v. Barnhart, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002)).  Because of this 'particularly important' duty, the ALJ has an affirmative

obligation to make reasonable efforts to obtain from Plaintiff's treating physicians any

necessary reports, including an assessment of Plaintiff's RFC.  <u>Dickson</u>, 2008 WL

4287389, at *13.

Plaintiff also argues that the ALJ failed to develop the record, with respect to Dr.

Bulawa, in order to clarify any ambiguities or conflicts in his opinions.  However, the ALJ

does not have a duty to re-contact a treating physician in the event he submits a report

inconsistent with other medical evidence, if the evidence the treating source submits as

a whole, is complete.  <u>See</u> <u>Harvey v. Astrue</u>, No. 5:05-CV-1094, 2008 WL 4517809, at

*9 (N.D.N.Y. Sept, 29, 2008); <u>Spruill v. Astrue</u>, No. 06-CV-5762, 2008 WL 4949326, at

*4 (S.D.N.Y. Nov. 19, 2008).

> Medical reports should include -- Medical history; Clinical findings (such as
> the results of physical or mental status examinations); Laboratory findings
> (such as blood pressure, x-rays); Diagnosis (statement of disease or injury
> based on its signs and symptoms); Treatment prescribed with response,
> and prognosis; and A statement about what you can still do despite you
> impairment(s)….

20 C.F.R. §§ 404.1513(b)(1)-(6); 416.913(b)(1)-(6).  Here, there is no indication that the

medical records received from Dr. Bulawa are in any way incomplete.  Indeed, Dr.

Bulawa's medical reports included all six of the factors set forth in 20 C.F.R. §§

404.1513(b)(1)-(6) and 416.913(b)(1)-(6).  Notably, Dr. Bulawa completed a medical

source statement addressing his opinions of Plaintiff's limitations (R. at 386-390).  There

is no indication that any further contact with Dr. Bulawa would have resulted in

additional evidence.

Therefore, the ALJ did not err in failing to re-contact Plaintiff's treating physician,

Dr. Bulawa.  However, because the ALJ failed to follow the treating physician rule, with

respect to Dr. Bulawa, it is recommended that this case be remanded to allow the ALJ an opportunity to do so.

### Allegation 3: The RFC Was Not Supported By Substantial Evidence

Plaintiff's third argument is that the ALJ erred by (a) not including Dr. Bulawa's MSS in his RFC determination, and (b) failing to complete a function-by-function analysis as required.  <u>See</u> Plaintiff's Brief, pp. 13-14.  Defendant responds by arguing that limiting Plaintiff to sedentary work fulfilled the ALJ's duty to complete a function-by-function analysis.  <u>See</u> Defendant's Brief, p. 19.

### (a) Failure to Include Dr. Bulawa's MSS in the RFC

As previously stated, the ALJ erred with respect to Dr. Bulawa.  <u>See</u> Allegation 2(a).  Therefore, Plaintiff's first argument will not be discussed as a determination of weight may well affect the ALJ's inclusion of Dr. Bulawa's MSS in the RFC analysis. On remand, the ALJ is instructed to fully evaluate Dr. Bulawa's MSS in the RFC as well as consider those deficiencies noted above.

### (b) Failure to Complete a Function-By-Function Analysis

As for Plaintiff's second argument, according to SSR 96-8p, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),[33] (c),[34] and (d)[35] of 20 CFR 404.1545 and 416.945.  Only

---

[33] "Physical abilities. … such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)…."  20 C.F.R. § 404.1545(b).

[34] "Mental abilities. … such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting…."  20 C.F.R. § 404.1545(c).

after that may RFC be expressed in terms of the exertional levels of work …."  SSR 96-8p, 1996 WL 374184 at *1.

While other circuits have held that the SSR's language does not necessarily create an obligation to make a function-by-function analysis, the Second Circuit has not directly ruled on this issue.  See Delgado v. Comm'r. of Soc. Sec., 30 Fed.Appx. 542, 547 (6th Cir. 2002); Bencivengo v. Comm'r of Soc. Sec., 251 F.3d 153 (3d Cir. 2000) (table).  However, the Southern District of New York appears to follow the Third and Sixth Circuits' more flexible approach to the SSR's requirement.  See Novak v. Astrue, No. 07 Civ. 8435, 2008 WL 2882638, at *3, n. 47 (S.D.N.Y. July 25, 2008) (quoting Casino-Ortiz v. Astrue, 2007 WL 2745704, at *13-14 (S.D.N.Y. Sept. 21, 2007) (finding a function-by-function analysis not required, merely desirable, because the ALJ adequately supported his RFC with medical evidence from the record)). On the other hand, the Northern District of New York has repeatedly found it error to not make a function-by-function analysis.  See Miles v. Barnhart, No. 6:06-CV-391, 2008 WL 5191589, at *9 (N.D.N.Y. Dec. 8, 2008); Crysler v. Astrue, 563 F.Supp.2d 418, 437 (N.D.N.Y. 2008); McEaney v. Comm'r of Soc. Sec., 536 F.Supp. 252, 258-9 (N.D.N.Y. 2008).

In this case, the ALJ never engaged in a function-by-function analysis.  As for Plaintiff's RFC, the ALJ determined that:

> the claimant retains the residual functional capacity to perform a wide range of unskilled sedentary exertional activity, subject to walking and standing no more than four hours total per day; no more than occasional

---

[35] Other abilities affected by impairment(s). … such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions…."  20 C.F.R. § 404.1545(d).

climbing, balancing, stooping, kneeling, crouching and crawling; and no
more than occasional relating with other persons.

(R. at 23).  Notably, the ALJ did not make a finding as to Plaintiff's ability to sit or lift.

Although the definition of sedentary work includes the requirement that Plaintiff cannot

lift more than ten pounds, to not first make a functional finding as to Plaintiff's ability to

lift before finding she is capable of sedentary work is error.  See McMullen v. Astrue,

No. 5:05-CV-1484, 2008 WL 3884359, at *6 (N.D.N.Y. Aug. 18, 2008) (finding that "the

ALJ erred in determining that Plaintiff could do light work before fully assessing his

work-related abilities on a function-by-function basis").

Because it has been recommended that this case be remanded for failure to

follow the treating physician rule, the ALJ's RFC finding is necessarily flawed.  However,

on remand, this Court notes that the ALJ must make a function-by-function finding

before finding Plaintiff capable of performing sedentary work.

### Allegation 4: The VE's Testimony Was Flawed Because it Was Based on an Incomplete Hypothetical

Plaintiff's final argument is that the ALJ erred in basing the hypothetical given to

the VE on the findings of the disability analyst.  See Plaintiff's Brief, pp. 14-17.

Defendant responds by arguing that the hypothetical was based on substantial

evidence.  See Defendant's Brief, pp. 19-21.

Whether the hypothetical given to the VE is appropriate depends on if it fully

encompasses Plaintiff's physical and mental limitations.  Magee v. Astrue, No. 5:05-CV-

413, 2008 WL 4186336, at *20 (N.D.N.Y. Sept. 9, 2008) (citing Varley v. Sec'y of Health

& Human Servs., 820 F.2d 777, 799 (6th Cir. 1987)).  "If the factors set forth in the

hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability." Id.

Because the ALJ erred both by not completing an adequate analysis of Plaintiff's credibility, and in not following the treating physician rule, the hypothetical given to the VE was necessarily flawed.  However, the Court notes that the ALJ's RFC and the hypothetical given to the VE both appear to be largely based on the physical RFC created by the disability analyst consulting for the SSA (R. at 326-333, 23, 542-543). The disability analyst's findings were made on April 1, 2002, before Plaintiff's right knee surgery on September 13, 2002, and both carpel tunnel surgeries, on April 9, 2002 and February 11, 2003 (R. at 326, 368, 411, 416).  Although the analyst's opinions were certainly relevant for the time period in which they were created, given Plaintiff's multiple surgeries after the report was established, and the MSS supplied by Dr. Bulawa on September 25, 2003, reliance on the disability analyst's opinion may have been misplaced (R. at 390).  See Huhta v. Barnhart, 328 F.Supp.2d 377, 386 (W.D.N.Y. 2004) (finding legal error to rely on the opinion of a non-examining physician for the time period after it was created, when plaintiff's condition deteriorated substantially after the report was produced and it was inconsistent with the opinions of plaintiff's treating physicians).

Thus, on remand, the ALJ should consider any other limitations established for Plaintiff that may be appropriate after a more thorough credibility analysis, as well as appropriately weighing each medical source who gave opinions of Plaintiff's limitations, when presenting a hypothetical to the vocational expert.

# Conclusion

Based on the foregoing, it is recommended that Defendant's motion for judgment on the pleadings should be DENIED; Plaintiff's cross motion for judgment on the pleadings should be DENIED in part and GRANTED in part and REMANDED for reconsideration.

Respectfully submitted,

_____

Victor E. Bianchini
United States Magistrate Judge


DATED:   Syracuse, New York
         February 13, 2009

## ORDERS

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby


**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.


**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

 *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);   *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);   *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

Victor E. Bianchini
United States Magistrate Judge


DATED:       Syracuse, New York
             February 13, 2009